# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

SERVICE WOMEN'S ACTION )
NETWORK and VIETNAM )
VETERANS OF AMERICA, )
)
    Petitioners, )
v. ) No. 14-7115
)
ROBERT A. MCDONALD, ) Appeal of Denial of Petition for
Secretary of Veterans Affairs, ) Rulemaking by the Secretary of
) Veterans Affairs Pursuant to 38 U.S.C.
    Respondent. ) § 502; Fed. Cir. R. 47.12
)

# PETITIONERS' CORRECTED OPENING BRIEF

Michael J. Wishnie, Supervising Attorney
Veterans Legal Services Clinic
Jerome N. Frank Legal Services Org.
P.O. Box 209090
New Haven, CT 06520-9090
(203) 432-4800

*Counsel for Petitioners*

# CERTIFICATE OF INTEREST

Counsel for the Petitioners certifies the following:

1.      The full name of every party or amicus represented by me is:

        Service Women's Action Network
        Vietnam Veterans of America

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

        The real interest parties are named.

3.      All parent corporations and any publicly held corporations that own 10 percent or more of the stock the party or amicus curiae represented by me are:

        None. No publicly-held corporation owns 10 percent or more of Service Women's Action Network or Vietnam Veterans of America.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

        Jerome N. Frank Legal Services Organization; Michael Wishnie, Supervising Attorney.


                       /s/ Michael J. Wishnie

December 4, 2014               Michael J. Wishnie

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................ i

TABLE OF AUTHORITIES ................................................................ iv

STATEMENT OF RELATED CASES ................................................ 1

JURISDICTIONAL STATEMENT ................................................... 2

STATEMENT OF THE ISSUES ....................................................... 3

STATEMENT OF THE CASE ........................................................... 3

    *I. Military Sexual Trauma is Pervasive and Deeply Debilitating* ..................... 4

    *II.  VA Treats MST Survivors Differently than Other Veterans, Creating Serious Obstacles to Disability Benefits* ................................. 5

    *III. For Years, VA Has Rejected Requests to Amend Its MST Regulations* ... 12

SUMMARY OF ARGUMENT ........................................................ 17

ARGUMENT ................................................................................... 20

I.   VA'S DENIAL OF THE RULEMAKING PETITION IS ARBITRARY AND CAPRICIOUS IN VIOLATION OF THE APA ................................. 20

    A.   Standard of Review ...................................................... 21

    B.   VA Fails to Provide Even A Single Reasoned Explanation for Its Departure from Past Practice for Hard-to-Prove Claims ......................... 24

    C.   The Failure to Give Reasoned Consideration to Important Factors is Especially Egregious Because MST is a Proxy for Gender .................... 29

    D.   VA's Failure to Address Wide Variation in Grant Rates Across the Country Further Evidences the Unreasonableness of its Denial ............ 31

    E.   An Accommodation for MST-related PTSD Claims is Consistent With the Plain Meaning of VA's Authorizing Statute ....................... 34

II. VA'S DENIAL IS DISCRIMINATORY IN VIOLATION OF THE
EQUAL PROTECTION COMPONENT OF THE FIFTH AMENDMENT .. 37

A.   VA's Denial is Subject to Heightened Scrutiny, Which It Fails ............. 38

B.   VA's Denial Also Fails Rational Basis Review ..................................... 44

CONCLUSION .................................................................................................... 50

CERTIFICATE OF COMPLIANCE ..................................................................... 51

ADDENDUM ...................................................................................................... 52

# TABLE OF AUTHORITIES

## CASES

*Am. Horse Prot. Ass'n, Inc. v. Lyng,*
    681 F. Supp. 949 (D.D.C. 1988) .................................................. 23

*Animal Legal Def. Fund v. Madigan,*
    781 F. Supp. 797 (D.D.C. 1992).................................................. 36

*Atchison, T. & Santa Fe Ry. Co. v. Wichita Bd. of Trade,*
    412 U.S. 800 (1973) ................................................................... 22

*Berkley v. United States,*
    287 F.3d 1076 (Fed. Cir. 2002) ................................................. 38

*Bolling v. Sharpe,*
    347 U.S. 497 (1954) ................................................................... 38

*Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.,*
    403 F.3d 771 (D.C. Cir. 2005).................................................... 26

*Chevron* v. *NRDC, Inc.,*
    467 U.S. 837 (1984) ................................................................... 35

*City of Cleburne, Tex. v. Cleburne Living Ctr.,*
    473 U.S. 432 (1985) ............................................................ 44, 49

*Dailey v. City of Lawton,*
    425 F.2d 1037 (10th Cir. 1970) ................................................. 39

*Dothard v. Rawlinson,*
    433 U.S. 321 (1977) ........................................................... 41, 42

*Eagleston v. Guido,*
    41 F.3d 865 (2d Cir.1994) ......................................................... 41

*Frontiero v. Richardson,*
    411 U.S. 677 (1973) ................................................................... 37

*Greater Boston Television Corp.*, v. *F.C.C.*,
    444 F.2d 841 (D.C. Cir. 1970)................................................................ 22, 29

*Islander E. Pipeline Co., LLC v. Connecticut Dep't of Envtl. Prot.*,
    482 F.3d 79 (2d Cir. 2006) ....................................................................22-23

*Judulang* v. *Holder*,
    132 S. Ct. 476 (2011) ................................................................................. 21

*Lawrence v. Texas*,
    539 U.S. 558 (2003) ................................................................................... 50

*Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*,
    741 F.3d 1309 (D.C. Cir. 2014) ................................................................ 27

*Mem'l Hosp. v. Maricopa Cnty.*,
    415 U.S. 250 (1974) .........................................................................45-46, 47

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut.*
*Automobile Ins. Co.*,
    463 U.S. 29 (1983) ..................................................................................... 21

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
    551 U.S. 644 (2007) ................................................................................... 22

*N.L.R.B. v. Food Store Employees Union, Local 347*,
    417 U.S. 1 (1974) ....................................................................................23-24

*NMB Singapore Ltd.* v. *United States*,
    557 F.3d 1316 (Fed. Cir. 2009) ................................................................ 21

*Patton v. West*,
    12 Vet. App. 272 (1999)............................................................................... 8

*Pers. Adm'r of Massachusetts v. Feeney*,
    442 U.S. 256 (1979) ............................................................................. 38, 42

*Plyler v. Doe*,
    457 U.S. 202 (1982) ................................................................................... 46

*Preminger v. Sec'y of Veterans Affairs,*
　　632 F.3d 1345 (Fed. Cir. 2011) ..................................................... 2

*Ricketts v. City of Columbia,*
　　36 F.3d 775 (8th Cir.1994) ......................................................... 41

*Romer v. Evans,*
　　517 U.S. 620 (1996) ............................................................ 44, 50

*Sec. & Exch. Comm'n v. Chenery Corp.,*
　　318 U.S. 80 (1943) ................................................................... 23

*Sec. & Exch. Comm'n v. Chenery Corp.,*
　　332 U.S. 194 (1947) ........................................................21-22, 27

*Shays v. Fed. Election Comm'n,*
　　424 F. Supp. 2d 100 (D.D.C. 2006) ........................................... 23

*SKF USA Inc. v. United States,*
　　630 F.3d 1365 (Fed. Cir. 2011) ................................................. 26

*Soto v. Flores,*
　　103 F.3d 1056 (1st Cir.1997) ................................................... 41

*U.S. Dep't of Agric. v. Moreno,*
　　413 U.S. 528 (1973) ................................................................. 45

*United States v. Virginia,*
　　518 U.S. 515 (1996) ....................................................... 38, 40, 43

*United States v. Windsor,*
　　133 S. Ct. 2675 (2013) ............................................................. 39

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,*
　　455 U.S. 519 (1978) ................................................................. 22

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
　　429 U.S. 252 (1977) ............................................................38-39

*Washington v. Davis,*
    426 U.S. 229 (1976) ............................................................................ 40

## STATUTES

5 U.S.C. § 553 ..................................................................................... 2
        § 706 ................................................................................. 2, 3, 23
38 U.S.C. § 501(a) ..................................................................... 6, 7, 24, 34
        § 502 ............................................................................................ 2
        § 1154 ................................................................................. 34, 35
        § 1154(a) .................................................................. 17, 34, 35
        § 5103A ....................................................................................... 6
        § 5107(b) .................................................................................. 32

## REGULATIONS AND ADMINISTRATIVE MATERIALS

38 C.F.R. pt. 3 ................................................................................... 41
        §§ 3.304-3.309 ................................................................... 6, 39
        §§ 3.304(f)(1)-(f)(4) ................................................................ 47
        § 3.304(f)(2) .............................................................................. 7
        § 3.304(f)(3) ..................................................................... passim
        § 3.304(f)(4) .............................................................................. 7
        § 3.304(f)(5) ..................................................................... passim
        § 3.307(a) .............................................................................. 6, 7
        § 3.307(d) .................................................................................. 7
        § 3.309(c) ................................................................................... 6
13 Fed. Reg. 4316 (July 28, 1948) ..................................................... 6
26 Fed. Reg. 1561 (Feb. 24, 1961) ................................................... 41
35 Fed. Reg. 18,280 (Dec. 1, 1970) ............................................... 6-7
52 Fed. Reg. 37,170 (Oct. 5, 1987) ................................................... 7
58 Fed. Reg. 29,107 (May 19, 1993) ................................................. 7
59 Fed. Reg. 5106 (Feb. 3, 1994) ...................................................... 7
64 Fed. Reg. 32,807 (June 18, 1999) ................................................ 7
74 Fed. Reg. 42,617 (Aug. 24, 2009) .............................................. 46
75 Fed. Reg. 39,843 (July 13, 2010) ......................................... 7-8, 47
78 Fed. Reg. 54,763 (September 6, 2013) .................................. 40-41

## STATEMENT OF RELATED CASES

The Secretary initially ignored Petitioners' rulemaking petition. Accordingly, Petitioners filed suit in this Court to compel the agency to adjudicate their pending rulemaking petition. *Service Women's Action Network, et al. v. Shinseki*, No. 14-7079 (Fed. Cir. filed May 6, 2014). Respondent thereafter adjudicated the rulemaking petition by denying it. Petitioners voluntarily dismissed their suit to compel adjudication as moot, without prejudice and without fees or costs to either side.

Petitioners are unaware of any other appeals stemming from this action that were previously before this Court or any other appellate court. In the opinion of Petitioners' counsel, there are no pending cases that may be directly affected by this Court's decision in the pending appeal.

# JURISDICTIONAL STATEMENT

The United States Court of Appeals for the Federal Circuit has exclusive jurisdiction to review rules and regulations of the U.S. Department of Veterans Affairs (VA). 38 U.S.C. § 502; 5 U.S.C. § 706 (stating that federal courts may "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"); Fed. Cir. R. 47.12 (governing actions for judicial review under 38 U.S.C. § 502). This jurisdiction extends to review of VA's denial of a petition for rulemaking. *Preminger v. Sec'y of Veterans Affairs*, 632 F.3d 1345, 1352 (Fed. Cir. 2011) ("[W]e hold that § 502 vests us with jurisdiction to review the Secretary's denial of a request for rulemaking made pursuant to [5 U.S.C. ] § 553(e)."). Review is timely because the VA denied Petitioners' rulemaking petition on July 14, 2014, A4,[1] and Petitioners filed the instant petition for review well within the 60 days allotted for appeal. (ECF. No. 1-2 filed Aug. 7, 2014).

---

[1] References to "A___" are to the jointly-prepared Appendix to be filed at the completion of briefing.

## STATEMENT OF THE ISSUES

I. Is the Secretary's denial of the Petition for Rulemaking arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), when it fails to offer any adequate explanation, give reasoned consideration to important factors, or properly interpret its governing statute?

II. Does the Secretary violate the equal protection component of the Fifth Amendment by denying Petitioners' rulemaking petition in an unjustified departure from past practices that reflects discriminatory animus and results in a discriminatory effect?

## STATEMENT OF THE CASE

Across the United States Armed Services, survivors of rape, sexual assault, and sexual harassment (collectively, "military sexual trauma" or "MST"), face unique burdens in reporting, documenting, and treating their trauma—and, as a result, in obtaining benefits for disabilities resulting from MST. VA routinely adopts or modifies regulations to account for the difficulty veterans with unique injuries or illnesses face in securing benefits for their service-related injuries. In fact, for decades, VA has adopted evidentiary presumptions and other accommodations to ensure that veterans receive timely, accurate, and predictable claims decisions so that wounded veterans may receive the care and benefits their service has earned.

For MST survivors, however, VA refuses to provide an evidentiary accommodation in line with past presumptions. Despite publicly and privately acknowledging the precise challenges of seeking MST-related disability compensation, VA demands that MST survivors present additional evidence of their trauma and undergo additional review. In so doing, VA erects substantial and discriminatory obstacles to MST survivors seeking disability benefits.

I.    *Military Sexual Trauma is Pervasive and Deeply Debilitating*

Military sexual trauma pervades the U.S. armed services. Thousands of servicemembers are raped, sexually assaulted, or sexually harassed each year while serving on active or inactive duty. In 2012 alone, 26,000 servicemembers experienced unwanted sexual contact. A220. Overall, VA estimates that more than half a million veterans have experienced MST. A310. The rate is staggeringly high for female veterans, of whom VA estimates nearly one in three have survived MST. A309. Often, these assaults are not isolated incidents. In a 2003 study, 37% of servicewomen who had reported a rape stated that they had been raped at least twice. A310. In addition, 14% reported experiences of gang rape. *Id.*

Sexual trauma causes grave physical and emotional harm. MST takes a toll on mental health, family relationships, employment prospects, and the capacity for intimacy, leading to greater risk of isolation, poverty, substance abuse, and homelessness. A312. A recent study found that 53% of homeless female veterans

were sexually assaulted while in service. *Id*. VA itself recognizes that MST survivors face a host of mental health challenges, including problems with attention, concentration, and memory; feelings of numbness; trouble sleeping; alcohol and drug problems; and physical health problems including sexual difficulties, chronic pain, weight or eating problems, and gastrointestinal problems. A313.

In fact, sexual violence is more closely correlated with PTSD than any other service-related stressor, including combat. As a result, MST survivors suffer from PTSD at exceedingly high rates. A313. From 2010 to 2013, PTSD was the most commonly cited disability caused by MST, comprising about 94% of all MST-related claims processed during that period. A224-25. Moreover, a VA study concluded that female MST survivors face a 59% higher risk for developing mental health disorders than veterans generally, and male survivors face an elevated risk of 40%. A313.

## II. *VA Treats MST Survivors Differently than Other Veterans, Creating Serious Obstacles to Disability Benefits*

In the United States, veterans with service-related injuries are entitled to disability benefits to help supplement or replace lost income, support their families, and ease the financial burdens of their disability. A170. In general, eligibility for benefits is contingent on a veteran's ability to prove that his or her disabilities are service-connected. Veterans must provide evidence of a present disability, the

occurrence of an in-service event, and, finally, a nexus between the in-service event and present disability. A301-02.

Since the end of World War I, however, VA and its precursors have adopted a significant number of evidentiary accommodations to minimize the time, effort, and investigatory burden on the veteran and the government to prove disability claims. *See* 38 U.S.C. § 5103A ("The Secretary shall make reasonable efforts to assist a claimant in obtaining evidence . . ."). From the 1940s through the 2000s, Congress, the original Veterans Administration, and the modern VA adopted accommodations for over 150 health outcomes as veterans returned from World War II, Vietnam, and the two Gulf Wars. *See* 38 C.F.R. §§ 3.304-3.309.

As each major conflict produced distinct disabilities and diseases, VA adopted disability-specific accommodations pursuant to the agency's general rule-making authority set forth at 38 U.S.C. § 501(a), or to fulfill congressional mandates. Following the Second World War, VA adopted accommodations for certain chronic and tropical diseases contracted during service. *See* 38 C.F.R. §§ 3.307(a) (originally promulgated in 13 Fed. Reg. 4316, 4317 (July 28, 1948)). In the aftermath of the Korean War, VA adopted accommodations for former prisoners of war (POWs) suffering from several disabilities. *See* 38 C.F.R. §§ 3.307(a)(5), 3.309(c) (presumption for POWs for frostbite, post-trauma osteoarthritis, and chronic anxiety) (originally promulgated in 35 Fed. Reg. 18,280,

18,281-82 (Dec. 1, 1970) and extended in 52 Fed. Reg. 37,170, 37,173 (Oct. 5, 1987)). Similarly, for veterans who served in Vietnam War, VA adopted new accommodations for exposure to Agent Orange and other herbicides in Vietnam. *See* 38 C.F.R. § 3.307(a)(6) (originally promulgated in 58 Fed. Reg. 29,107, 29,109 (May 19, 1993) and extended in 59 Fed. Reg. 5106, 5106 (Feb. 3, 1994)). Under each of these presumptions, the veteran's own testimony and a medical diagnosis of a present disability are generally sufficient to prove service-connection. Lay testimony is challenged only if there is appropriate contradictory evidence in the record. *See, e.g.*, 38 C.F.R. § 3.307(d) (creating narrow grounds for rebuttal of presumption of service-connection for chronic, tropical, or prisoner-of-war related disease).

Recently, VA also adopted specific accommodations for veterans seeking benefits for PTSD based on various stressors. *See, e.g.*, 38 C.F.R. § 3.304(f)(2) (presumption for combat-related PTSD) (originally promulgated in 64 Fed. Reg. 32,807, 32,808 (June 18, 1999)); 38 C.F.R. § 3.304(f)(4) (presumption for prisoner-of-war related PTSD) (originally promulgated in 64 Fed. Reg. 32,807, 32,808 (June 18, 1999)). Most recently, in 2010, the VA adopted 38 C.F.R. § 3.304(f)(3), which "eliminates the requirement for corroborating that the claimed in-service stressor occurred" for veterans seeking benefits for PTSD based on fear of hostile or military terrorist activity. Stressor Determinations for Posttraumatic

Stress Disorder, 75 Fed. Reg. 39,843, 39,852 (July 13, 2010) (codified at 38 C.F.R. § 3.304(f)(3)). VA properly adopted this rule pursuant to its general statutory authority to promulgate necessary regulations, 38 U.S.C. § 501(a), on the basis of a single Institute of Medicine study, recognizing the "inherently stressful nature of places, types, and circumstances of service in which fear of hostile military or terrorist activities is ongoing." 75 Fed. Reg. at 39,843.

Meanwhile, VA treats MST claims differently. In 2002, in response to *Patton v. West*, 12 Vet. App. 272, 284 (1999) (remanding PTSD claim to address evidence of sexual assault as an in-service stressor), *see* A221, and increasing reports of sexual assault in the armed forces, VA promulgated 38 C.F.R. § 3.304(f)(5), which treats MST claims as a subset of personal assault claims. Under section 3.304(f)(5), a veteran's lay testimony, coupled with a diagnosis of PTSD, is insufficient to establish the occurrence of a claimed stressor. Instead, a veteran with MST-related PTSD must present corroborating evidence of his or her sexual trauma and, per VA's discretion, undergo additional review by a third party.

Section 3.304(f)(5) identifies the forms of corroborating evidence, known as "markers," A46, that it expects veterans to have retained years after experiencing sexual trauma: "records from law enforcement authorities, rape crisis centers, mental health counseling centers, hospitals, or physicians; pregnancy tests or tests

8

for sexually transmitted diseases; and statements from family members, roommates, fellow service members, or clergy." 38 C.F.R. § 3.304(f)(5). The regulation also assumes that if a sexual assault occurred, the veteran would have displayed certain types of behavioral changes that could be illustrated through "a request for transfer to another military duty assignment; deterioration in work performance; substance abuse . . . or unexplained economic or social behavior changes." *Id.*

Additionally, section 3.304(f)(5) explicitly permits VA to "submit any evidence that it receives to an appropriate medical or mental health professional for an opinion as to whether it indicates that a personal assault occurred." *Id.* Out of dozens of evidentiary regulations covering 150 different health outcomes, section 3.304(f)(5) is the only regulation that expressly permits VA to seek outside review to determine whether an in-service stressor occurred. No other regulation allows, or even mentions, additional review to verify if a veteran is being honest.

Despite its length, this unwieldy regulation does not address the unique nature of MST. Survivors are unlikely to report their assaults, much less retain a used pregnancy test. If a servicemember attempts to report an assault, she is likely to face serious professional and social resistance and retaliation. A220-21 ("[MST] claims can be difficult to substantiate, given that servicemembers may be unwilling to file formal complaints at the time of the precipitating incident or incidents and,

hence, lack official documentation to support their claim."); A171 ("Because systemic under-reporting of in-service sexual trauma often limits the amount of documentation surrounding that trauma, producing corroborating evidence can often be difficult."); A303 ("Service members who experience MST are unlikely to report their attack—even less likely than civilians who experience sexual assault."). As a result, the Department of Defense (DoD) estimates that in 2012, 89% percent of servicemembers who experienced sexual assault did not report it to a DoD official. A323.

The difficulty of providing direct evidence is exacerbated by a DoD policy that existed until 2014, which required DoD to destroy confidential reports of MST after only five years, A327, and the evidence collected along with these reports after only one year, A33. Due to underreporting of MST and destruction of records, it was and is common for the military record of an MST survivor to include no mention of the assault.[2]

VA's 2002 decision to accept corroborating evidence makes little difference when MST survivors are unlikely to report their attacks formally to DoD or informally to medical clinics, friends, or family. *See* A318. Because the same fear of professional or social repercussions discourages survivors from reporting attacks

---

[2] The National Defense Authorization Act for Fiscal Year 2014 changed the policy to preserve such reports for 50 years. This revision cannot benefit service members whose reports were destroyed prior to 2014. H.R. 3304, 113th Cong. (2013).

at all, secondary evidence, like direct evidence, is likely to be unavailable. *Id.*

As a result of section 3.304(f)(5)'s heightened evidentiary burdens, VA disproportionately denies or delays thousands of MST survivors the disability benefits that they have earned through their service. First, VA denies MST-related PTSD claims at a higher rate than all other PTSD claims, A233, and subjects MST-related claims to greater delays, A274. From 2008 to 2012, claimants with MST-related PTSD were 16.5 to 29.6 percentage points *less likely* to obtain VA disability benefits than claimants with PTSD related to other stressors. A173. The disparity was especially high for men. In the same period, male claimants with MST-related PTSD were 20.8 to 37.4 percentage points less likely to obtain benefits than male claimants with non-MST related PTSD. A175.

Second, VA's current regulatory scheme results in wide variation in the adjudication of MST claims across VA Regional Offices. GAO reports that in 2013, approval rates among regional offices ranged from 14 to 88 percent, with only half of the offices approving claims at rates close to the average. A217.

Third, VA's current regulation disproportionately impacts women. Between 2008 and 2012, women submitted 66.1% of MST-related PTSD claims and only 4.6% of other PTSD claims. A172. VA reported to the House and Senate Appropriations Committees that in the most recent fiscal year, women made up 63% of claimants. A271. Men filed only 34% of MST-related PTSD claims

between 2008 and 2012, A172, and only 35% in 2013, A273. As a result, female veterans disproportionately face a higher evidentiary burden when seeking recognition of their service related injuries, while proof of injuries that disproportionately affect men has been eased through VA's adoption of dozens of accommodations.

For decades, VA has accepted as trustworthy lay testimony of an in-service stressor in combination with a medical diagnosis of a current disability for injuries and illnesses that disproportionately affect men. In such cases, VA may reject lay testimony only if there is contradictory evidence in the record. With respect to claims for PSTD resulting from MST, however, VA has refused to accept a medical diagnosis plus lay testimony alone.

III.    *For Years, VA Has Rejected Requests to Amend Its MST Regulations*

Many public and private actors have questioned VA's adjudication of MST-related disability claims. Since 2002, multiple Members of Congress have voiced concern about the fairness and adequacy of VA's evidentiary standard for MST-related claims. The GAO has found, among other failings, that adjudicators fail to accurately and consistently apply a broader standard of evidence when considering PTSD claims related to MST. A221.

On multiple occasions, Members of Congress have directly urged the VA Secretary to ease the evidentiary burden on MST survivors by simplifying VA's

existing regulation. In December 2013, a coalition of over thirty Members of Congress sent a joint letter to the Secretary of VA, urging "the agency to address the current disparity between grant rates of disability claims for . . . PTSD caused by military sexual trauma and claims for PTSD arising from other causes." A205. In June 2014, Members of Congress again wrote to the Secretary, urging him "to exercise [his] authority and ease the burden of proof for MST survivors by simplifying the current regulation." A213.

Similarly, based on data provided by VA in settlement of a Freedom of Information Act lawsuit, *see Service Women's Action Network, et al., v. U.S. Dept. of Defense, et al.,* No. 3:10-cv-1953 (D. Conn. settlement approved May 10, 2013) (ECF No. 71), Service Women's Action Network (SWAN) and the American Civil Liberties Union (ACLU) published a report examining the experiences of MST survivors who have sought disability compensation. *See* A167-204. This publicly released report reveals the disparity in grant rates for claims based on MST-related PTSD as compared to other forms of PTSD, the disparate grant rates based on gender, *see* A175-76, and the widespread geographic variation among VA Regional Offices, *see* A177-80. The findings demonstrate an "urgent need for a number of changes in how VA handles mental health disability benefit claims arising from" MST. A183. Specifically, the report urges VA to "relax the evidentiary standard that applies to survivors of military sexual trauma under 38

C.F.R. § 3.304(f)(5)." *Id.* Petitioner SWAN also led a national campaign to educate policymakers, the media, health professionals, and nonprofit organizations about the causes and consequences of MST. *See* A306.

Nevertheless, VA ignored years of requests to reform its claims adjudication process for MST survivors and adopt the same types of evidentiary accommodations it uses for many other difficult-to-document claims suffered disproportionately by men. As a result, SWAN and Vietnam Veterans of America (VVA) submitted the instant Petition for Rulemaking in July 2013. SWAN and VVA asked VA to commence a formal rule-making process and amend VA regulations to provide the same type of evidentiary accommodation for survivors of MST-related PTSD as VA now properly provides for veterans suffering from combat and fear-related PTSD. A299-359.

V.    *VA Summarily Denied Petitioners' Rulemaking Request*

Consistent with VA's past practices regarding MST, VA ignored the Petition for Rulemaking, forcing Petitioners to file suit before this Court merely to compel adjudication. *Service Women's Action Network v. Shinseki*, No. 14-7079 (Fed. Cir. filed May 6, 2014). On July 14, 2014, VA formally denied the Petition for Rulemaking in a three-and-a-half page decision, *see* A4-7, and Petitioners voluntarily dismissed their initial Petition for Review.

In its denial letter, VA devotes a significant amount of space to restating

Petitioner's arguments and section 3.304(f)(5)'s terms with little analysis. From the

remaining sections, only three arguments against the Petitioners' proposed rule

emerge. First, VA defends its secondary marker system by explaining that section

3.304(f)(5) lists a "variety of sources that may provide . . . corroborating evidence"

and that the list itself is not exclusive. A5. In defense of its requirement for marker

evidence, VA does not address the difficulty of acquiring *any* documentation of

sexual trauma, nor why this requirement is imposed on MST survivors but not

servicemembers who suffer PTSD due to other stressors. *See supra* Statement of

the Case, at 9.

Second, VA responds to concerns about adjudicator bias, inconsistent

adjudication, and disparate grant rates with the bare assertions that "VA is

committed to serving our Nation's Veterans by accurately adjudicating claims

based on MST in a fair, consistent, and thoughtful manner," and that the agency "is

very mindful of the uniquely sensitive nature of these claims." A5. VA then points

out that the agency may have denied meritorious MST-related claims between

2010 and 2013, later inviting thousands of those wrongfully-rejected disabled

veterans to resubmit their claims for further review. A6; *see also* A231 ("VBA sent

2,667 notification letters to veterans whose PTSD claims related to MST were

denied between September 2010 and April 2013."). VA's letters did not include

phone numbers to reach VA staff experienced with MST claims, and veterans with

wrongly adjudicated claims that predate 2010 "were not provided a letter notifying them of the opportunity" to resubmit their claims. A239.[3]

VA further advises that it provides training for its adjudicators. This training consists of "a 1.5 hour nationwide Microsoft Live Meeting broadcast on MST claims adjudication, and a separate 4-hour instructor-led training session on MST provided at VA regional offices." A5. In addition, "a 1.5 hour information session" instructs staff "how to conduct medical examinations of Veterans claiming disability as a result of MST." *Id*. VA does not mention that this information session is optional. A230. Nor does the agency reveal that the session "is not made available to contractors who conduct MST-related exams but are not directly employed by [the Veterans Health Administration]." *Id.*

VA insists that its training program has decreased the disparity between grant rates for MST-related PTSD claims and for PTSD claims overall. A6. VA does not address the wide regional variation for MST grant rates, however, which range between 14% and 88%. A234; A246. The agency's decision also makes no mention of the delays and re-traumatization caused by section 3.304(f)(5)'s evidentiary burden. *See* A273; A239 (explaining how the VA review process can "require the veteran to revisit very painful memories").

---

[3] In a letter to the Secretary, Members of Congress urged the VA to conduct "extensive outreach" to remediate the agency's "woefully insufficient" notification efforts, stating if "many veterans were incorrectly denied, than it is incumbent upon the agency to do everything it can to make it right." A213.

Third, VA states, erroneously, that it lacks the statutory authority to promulgate a presumption for MST-related PTSD, despite the fact that VA already provides accommodations for other service-related disabilities. The agency maintains that in-service rape and sexual assault is "not *indisputably* associated with *particular* places, types, and circumstances of service," such that the agency lacks authority to adopt the proposed regulatory presumption. A7 (emphasis added); *but see* 38 U.S.C. § 1154(a) (authorizing agency to engage in rulemaking upon "due consideration" of "places, types, and circumstances" of veteran's service, "as shown by such veteran's service record, the official history of each organization in which such veteran served, such veteran's medical records, and all pertinent medical and lay evidence"). The statute nowhere requires "markers," nor does it require an "indisputable" association with "particular" places, types, or circumstances of service, as VA misquotes in its denial letter.

Because VA's denial of the rulemaking petition is arbitrary, inadequate, discriminatory, and otherwise inconsistent with VA's own record, SWAN and VVA filed the instant petition for judicial review.

## SUMMARY OF ARGUMENT

Since World War I, VA has worked to reintegrate veterans into civilian life. In response to each major conflict of the twentieth and twenty-first centuries, VA adopted policies, regulations, and practices to more accurately administer

healthcare and disability benefits for the specific injuries and illnesses that arose during each conflict. But now, VA refuses to help its veterans access disability benefits for one of the most pervasive and destructive injuries of modern military life, an injury suffered disproportionately by women: military sexual trauma.

Specifically, VA denied SWAN and VVA's Petition to promulgate a new regulation on MST-related PTSD claims similar to regulations for other PTSD claims. The agency fails to give adequate reasoning and explanation for its departure from past practices for the one disability that disproportionately affects servicewomen. As such, VA's denial violates the Administrative Procedure Act and the equal protection component of the Fifth Amendment Due Process Clause.

First, VA violates the APA's prohibition against arbitrary and capricious decisionmaking by failing to explain why the agency treats MST claims differently than other claims, especially other PTSD claims. Instead, VA's denial relies on a single statistic to justify the burdens imposed on MST survivors by its current regulations, which result in delays, wrongful denials, and re-traumatization. For example, the denial fails to account for the consistently gendered application of current regulations to male and female MST survivors despite the fact that VA's own records and other statements acknowledge persistently disparate treatment.

Similarly, VA fails to consider the wide geographic variation in the adjudication of MST claims, which subjects veterans to arbitrary and inconsistent

claims determinations based on a "geographic lottery." VA also ignores the persistent gap between the approval rate for MST-related PTSD claims and that for other PTSD claims.

Instead of addressing these deficiencies, VA relies on a misinterpretation of its governing statute to claim that it lacks authority to undertake a rulemaking for MST-related PTSD claims. VA is incorrect. Its governing statute does not limit the agency's authority. In fact, under the statute, VA has a duty to consider the "places, types, and circumstances" of a veteran's service. Today, MST is a common circumstance of service, afflicting nearly one in three servicewomen.

Second, VA violates the equal protection component of the Fifth Amendment by departing from past practice, perpetuating archaic stereotypes, and discriminating against survivors of gender-based violence. Over the past century, VA has adopted more than 150 evidentiary accommodations for injuries typically suffered by men, but refuses to adopt one for MST—a signature injury for nearly one in three women who serve. This departure from past practice demonstrates that discriminatory animus against women has motivated VA's repeated refusal to consider an accommodation to assist MST survivors in accessing disability benefits. VA has not provided a persuasive, let alone "exceedingly persuasive," justification for its denial. As a result, VA fails to survive the heightened scrutiny to which MST survivors are entitled.

Moreover, even under rational basis review, VA's denial of the rulemaking petition violates the guarantee of equal protection. VA has distributed its benefits unequally, granting fewer benefits to MST survivors and making it more difficult for this class of veterans to seek disability benefits from VA. This additional burden bears no rational relationship to a legitimate state interest. Thus, VA's denial cannot survive even rational basis review.

For these reasons, VA's denial is unlawful and should be reversed or, in the alternative, vacated and remanded for VA to provide reasoned explanation or to institute a new rulemaking.

## ARGUMENT

### I. VA's Denial of the Rulemaking Petition is Arbitrary and Capricious in Violation of the APA

Under the APA, the government is required to engage in reasoned decisionmaking. VA's denial lacks a reasoned justification for maintaining the current regulations for veterans suffering from MST-related PTSD when it has successfully adopted evidentiary accommodations for so many other hard to prove disabilities, including, most recently, PTSD resulting from other stressors.

This failure to engage in reasoned decisionmaking is even more problematic where, as here, imposition of higher evidentiary standards on MST survivors amounts to discrimination along gender lines. That failure is compounded by the agency's subsequent refusal to address the inadequacy of current regulations,

which produce wide disparities in approval rates across the country. The fates of disability claims are left to a geographic lottery, administered by inconsistent and unpredictable adjudicators.

Finally, the agency's denial is grounded in a misinterpretation of VA's statutory authority. For these reasons, VA's denial should be reversed or, in the alternative, remanded for further consideration.

### A.    Standard of Review

The APA requires an agency to provide a reasoned explanation for its decisionmaking. *Judulang* v. *Holder*, 132 S. Ct. 476, 479 (2011); *see also Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 56 (1983) (setting aside agency decision to rescind federal automobile safety standard because the agency "failed to offer the rational connection between facts and judgment required to pass muster under the arbitrary and capricious standard"). As this Court has explained, an agency "must explain the basis for its decisions; while its explanations do not have to be perfect, the path of [the agency's] decision must be reasonably discernable to a reviewing court." *NMB Singapore Ltd.* v. *United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009).

An agency decision may be upheld only on the strength of the agency's own record and stated rationale. *Sec. & Exch. Comm'n v. Chenery Corp,* 332 U.S. 194, 196 (1947) [hereinafter *Chenery II*] (explaining that, in reviewing an action or

determination "which an administrative agency alone is authorized to make, [a reviewing court] must judge the propriety of such action solely by the grounds invoked by the agency"); *see also Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978) (judicial review must assess the reasonableness of an agency's "contemporaneous explanation" of its decision). Courts have found fatal defects in agency records that "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007).

Where the record contains certain "danger signals" of arbitrariness, the agency's obligation to provide a reasoned explanation of its decisionmaking takes on a particular urgency. *Greater Boston Television Corp.*, v. *F.C.C.*, 444 F.2d 841, 851 (D.C. Cir. 1970). Danger signals include an agency decision that is inconsistent with prior decisions or past practice, *Atchison, T. & Santa Fe Ry. Co.v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973) ("Whatever the ground for the departure from prior norms, however, it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate."), and a decision that appears to conflict with evidence in the administrative record*, see, e.g.*, *Islander E.*

*Pipeline Co., LLC v. Connecticut Dep't of Envtl. Prot.,* 482 F.3d 79, 103 (2d Cir. 2006) ("[W]here the record directly contradicts the unsupported reasoning of the agency and the agency fails to support its pronouncements with data or evidence, [the court] may not defer [to the agency].").

The APA instructs courts to "hold unlawful and set aside" agency decisions that are arbitrary and capricious. 5 U.S.C. § 706(2). When denials of rulemaking petitions are arbitrary and capricious, courts typically remand these decisions to the agency to undertake a new rulemaking or to provide reasoned consideration for its action. *See, e.g., Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 95 (1943) (directing the lower court to remand the matter back to the agency); *Shays v. Fed. Election Comm'n*, 424 F. Supp. 2d 100, 117 (D.D.C. 2006) (remanding to FCC to explain its decision or institute a new rulemaking after it refused to issue a rule governing when certain political organizations had to register as political committees); *Am. Horse Prot. Ass'n, Inc. v. Lyng*, 681 F. Supp. 949, 958 (D.D.C. 1988) (determining that the agency acted arbitrarily and capriciously in its failure to "take a hard look at the findings of researchers that it commissioned" and "order[ing] the agency to institute rulemaking proceedings . . . to promulgate regulations conforming to the [statutory] requirements."). In an "exceptional situation," a "crystal-clear" error by the agency may "render[] a remand an

unnecessary formality" and warrant outright reversal. *N.L.R.B. v. Food Store Employees Union, Local 347*, 417 U.S. 1, 8 (1974).

**B.     VA Fails to Provide Even A Single Reasoned Explanation for Its Departure from Past Practice for Hard-to-Prove Claims**

VA fails to explain why it rejected an evidentiary accommodation for MST-related PTSD claims similar to accommodations adopted for dozens of other types of disability claims, including most recently PTSD due to other stressors. The agency's failure amounts to a drastic departure from past practices without justification, rendering its denial arbitrary and capricious.

First, VA's denial of the Petition for Rulemaking is a significant departure from past practice. For over sixty years, VA has promulgated regulations establishing evidentiary presumptions for dozens of disabilities, covering 150 health outcomes, in response to concerns regarding the difficulty of documenting and adjudicating individual claims. *See supra* Statement of the Case, at 5-6. VA adopted some of these in response to specific statutory amendments and others pursuant only to the agency's general rule-making authority set forth at 38 U.S.C. § 501(a). Under each of these presumptions, lay testimony and a medical diagnosis are sufficient to prove service-connection. Neither corroboration nor secondary markers are required. For a veteran with an MST-related PTSD claim, however, no presumption exists, and VA may (and often does, *see supra* Statement of the Case, at 10-11) reject the veteran's lay testimony as insufficient. *See* 38 C.F.R. §

3.304(f)(5).

Instead, veterans who were sexually assaulted or harassed must produce documentary or other evidence of the assault to prove service-connection. *See supra* Statement of the Case, at 7-8. Given low reporting rates and the difficulty of documenting in-service sexual assaults, VA effectively places a higher evidentiary burden on MST claimants. *See supra* Statement of the Case, at 9-10.

Moreover, VA requires survivors of military sexual trauma to prove, in a humiliating process, that they are not lying. The regulation governing MST-related PTSD claims allows VA to "submit any evidence that it receives to an appropriate medical or mental health professional for an opinion as to whether it indicates that a personal assault *occurred*." 38 C.F.R. § 3.304(f)(5) (emphasis added). No other regulation expressly directs VA to seek outside review of evidence to prove that an in-service stressor *occurred*, only to prove that the stressor was connected to the veteran's symptoms. *See, e.g.*, *id.* § 3.304(f)(3) (establishing review by a "VA psychiatrist or psychologist, or a psychiatrist or psychologist with whom VA has contracted, [to] confirm[] that the claimed stressor is adequate to support a diagnosis of posttraumatic stress disorder and that the veteran's symptoms are related to the claimed stressor").

This provision calls into question the veracity of MST-related claims, subjecting survivor lay testimony to yet another layer of review. As a result, MST

survivors seeking benefits for their PTSD endure predictable consequences: re-traumatization, delayed or denied compensation for service-connected disabilities, and extensive discrepancies in adjudications. VA's treatment of MST-related claims sharply contrasts with VA's past practice for other hard-to-prove disability claims.

"When an agency changes its practice, it is obligated to provide an adequate explanation for the change." *SKF USA Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011). However, VA's denial does not provide a single reasoned explanation for distinguishing among veterans suffering from PTSD and applying different standards to MST survivors and non-MST survivors. *See generally* A4-7. VA's unexplained departure from its regular practice is arbitrary and capricious.

Rather than articulate an adequate rationale, VA's denial reaches the circular conclusion that its discrimination against MST survivors is permissible because VA has spent years attempting to address the failures of its discriminatory regulation. *See* A4-6. The mere assertion that VA has undertaken some limited measures to mitigate the evidentiary burdens on MST survivors does not discharge VA of its obligation to provide a reasoned explanation of its departure from past practices.

VA's lack of reasoned explanation is all the more problematic where the agency's departure from past practice results in discriminatory treatment of like

parties. "Where an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld." *Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005).

Once VA decided to alter evidentiary claims for veterans suffering from certain disabilities such as PTSD, it was required to justify its decision not to extend the same treatment to veterans with other hard-to-prove disabilities, especially other in-service stressors that result in PTSD. VA refuses to care for MST survivors by adopting a similar accommodation. Its failure to justify imposing different evidentiary standards for veterans who were sexually assaulted during service is arbitrary and capricious in violation of the APA. *See Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1313 (D.C. Cir. 2014) (remanding to Safety Administration to provide further explanation for dissimilar treatment of products in rule limiting portable electricity sources in checked airplane baggage).

The Court must evaluate VA's denial "solely by the grounds invoked by the agency." *Chenery II*, 332 U.S. at 196. Rather than provide a reasoned justification for treating MST survivors differently, VA invokes its internal training programs

as evidence that it has met the challenge of adjudicating MST-related claims. The agency's argument has no merit.

VA training on adjudicating MST claims is negligible. Of the few trainings that exist, most last less than two hours and some are optional. *See supra* Statement of the Case, at 15-16. In its one-hour training on PTSD exams, only 2 of the 54 PowerPoint slides address MST-related claims. A230. And VA provides only one statistic in support of its contention that training is addressing MST-related PTSD adjudication problems: the diminished but enduring gap between grant rates for MST-related PTSD and non-MST related claims.

The narrowed gap cannot bear the weight VA places on it. The agency's own records indicate that approval rates for MST-related PTSD claims have lagged well behind the rates for non MST-related PTSD claims for years. *See supra* Statement of the Case, at 10-11; *see also* A210. Even assuming *arguendo* the veracity of VA's claim that the gap narrowed somewhat last year,[4] VA does not dispute that discrimination against MST-related PTSD claims persists. A6. In fact, from 2011 to 2013, the annual grant rate for MST-related PTSD claims *declined* from 55 percent to 49 percent. A210.

---

[4] VA falsification of records in other contexts has recently come to light, *see, e.g.*, Richard A. Oppel, Jr. & Michael D. Shear, *Severe Report Finds V.A. Hid Waiting Lists at Hospitals*, N.Y. TIMES, May 28, 2014, further undermining the agency's claim that great weight should be placed on this single statistic in this case. *See also* A249 (GAO Report) (noting need for improvement in VA data-collection and analysis).

Moreover, VA's reliance on this one statistic ignores the fact that, when a medical professional has already diagnosed an MST survivor's PTSD, VA's high evidentiary burdens puts these survivors at significant risk of re-traumatization or "secondary victimization." *See* A317 ("Legal and medical personnel can engage in victim-blaming practices that exacerbate the survivor's trauma resulting in increased PTSD symptoms."). Additionally, the need to collect and review marker evidence results in MST claims being adjudicated more slowly, delaying provision of disability benefits that MST survivors have earned. *Compare* A273 (noting that in FY 2013, MST-related PTSD claims were completed in an average of 498 days) *with* A321 (noting that the average veteran waits 260 days). VA's failure to provide a justification for the denial of the rulemaking petition, coupled with its exclusive reliance on a single statistic that obscures persistent deficiencies and delays in MST adjudication, is arbitrary and capricious.

**C.    The Failure to Give Reasoned Consideration to Important Factors is Especially Egregious Because MST is a Proxy for Gender**

VA's inconsistent application of the current regulations along gender lines raises the very type of "danger signal" that warrants judicial intervention. *See Greater Boston*, 444 F.2d at 851; *supra* Part I.A, at 22. Its failure to give reasoned consideration to this gender disparity confirms that the agency's denial of the rulemaking petition was arbitrary and capricious in violation of the APA.

First, the unpredictable adjudication of MST claims creates gender disparities amongst similarly situated veterans. For example, compared to their male counterparts, servicewomen are significantly more likely to experience in-service sexual assault. Consequently, despite being a small minority of the total veteran population, female veterans submit more than 65% of the MST-related PTSD claims VA receives. *See supra* Statement of the Case, at 11. Servicewomen are therefore disproportionately burdened by the high evidentiary standards VA has imposed for MST-related PTSD claims.

Meanwhile, servicemen file a minority of the MST-related PTSD claims. Servicemen filed 34% of claims between 2008 and 2012 and 35% in 2013, *see supra* Statement of the Case, at 11, but their claims are denied at higher rates than comparable claims from servicewomen. VA reported to the House and Senate Appropriations Committees that in FY 2013, it granted 55% of the claims of female veterans but only 42% of claims by male veterans. *See* A271. VA gives little weight to the gendered disparities in grant rates.

Moreover, VA's own records acknowledge the persistent disparity between the approval rate for MST-related PTSD claims and the overall approval rate for all PTSD claims nationwide, *see supra* Statement of the Case, at 11, which results in disparate impact on both men and women. VA concedes that MST-related PTSD claims are granted at lower rates than all other PTSD claims. A116 (stating that

even after VA's additional training, VA's grant rate for MST-related PTSD claims still lagged at least seven percentage points behind the grant rate for all PTSD claims in February 2013). VA also recognizes the "unique evidentiary considerations" involved in MST. A79. Despite VA's repeated acknowledgment of these facts, VA does not afford adequate weight in its decisionmaking to the disparate impact of its MST claims procedures on servicewomen and servicemen. VA's failure to engage in reasoned decisionmaking, especially when its decision disproportionately impacts servicewomen, directly contradicts the mandate of the APA.

### D. VA's Failure to Address Wide Variation in Grant Rates Across the Country Further Evidences the Unreasonableness of its Denial

The ambiguity of the current regulations with respect to when and how secondary evidence should be considered in support of a claim continues to result in inconsistent adjudication and denial of many meritorious MST claims. There is no mention of this inconsistency in the denial itself. *See generally* A4-7. In other forums, such as letters to members of Congress, VA's acknowledgements of the problem are accompanied by perfunctory dismissals. *See, e.g.*, A211 ("The Department recognizes there is some variance in the MST/PTSD grant rates among VA regional offices that is an area of potential improvement."). VA's failure to address inconsistent adjudication, especially with respect to drastic variation in claim approval rates across VAROs, is arbitrary and capricious.

In their Petition for Rulemaking, Petitioners explain that "low approval rates for MST-related claims result 'from adjudicators' failure to properly apply their discretion." A330. Despite Congressional mandates to grant claimants the benefit of the doubt, *see* 38 U.S.C. § 5107(b), claim adjudicators typically view MST-related PTSD claims with suspicion, A329. Without adequate regulatory guidance, adjudicators deny "dozens of worthy MST-related claims as uncorroborated or not credible . . . wrongfully den[ying] veterans the benefits they need and deserve." A330.

This inconsistency results in a system so arbitrary that the outcome of a veteran's case depends more on a geographic lottery than on the evidence presented. No later than November 2013, VA was aware that average grant rates in multiple VAROs lagged far behind the national rates in fiscal years 2008 through 2012. A177-79. The 2014 GAO Report confirms that these disparities persist. *See supra* Statement of the Case, at 11. According to GAO, "the extent of the variation raises the question of whether the data reflect real differences in evidence or differences in how the requirements are interpreted and applied." A235.

GAO's investigation also provides qualitative evidence of VA's inconsistent application of the flawed regulation, confirming the need for a uniform presumption such as those adopted for PTSD due to other stressors. GAO interviewed VARO staff from four of five offices who "described ongoing

difficulty applying the broadened standards, . . . [with] several instances of widely varying interpretations." A217. For example, "[a]n MST adjudicator in one regional office told us she only counts evidence as a marker if it occurred within 2 months of the stated MST incident," even though agency guidance "does not provide a specific time frame for markers." A236. VA staff also described "variation in the thoroughness of [VA] medical exams used by adjudicators to reach decisions," and noted that some medical examiners "required more evidence than others to establish that an MST incident occurred." A217. Inconsistent adjudication led to so many errors that VA alerted thousands of veterans with previously denied MST claimants that their claims could be re-adjudicated. *See supra* Statement of the Case, at 15.

To date, training and adjudicator specialization have failed to address the inconsistent application of the current standard. In fiscal year 2012, the VA regional office for St. Paul, Minnesota reported an average grant rate of just 25.8% for all MST-related claims. A178. By comparison, the VA regional office in Los Angeles, California reported an average grant rate of 88.5% for the same year. A180. GAO finds that approval rates for MST-related claims varied from 14 to 88 percent among VAROs nationwide in fiscal year 2013. *See supra* Statement of the Case, at 11.

To avoid this sort of radical variation in adjudication of claims, VA has adopted uniform presumptions for PTSD due to stressors other than MST. Given VA's failure to engage with and address the unclear and inconsistent guidance of the current regulation and the resultant widely varied approval rates between VARO's nationwide, its denial of the rulemaking petition is arbitrary and capricious.

### E. An Accommodation for MST-related PTSD Claims is Consistent With the Plain Meaning of VA's Authorizing Statute

SWAN and VVA petitioned the Secretary of the VA to exercise his authority pursuant to 38 U.S.C. §§ 501(a), 1154 to promulgate regulations that provide adequate guidance for the adjudication of MST-related PTSD claims. *See supra* Statement of the Case, at 13-14; A306. VA responds that it lacks authority under the latter statutory provision to do so. *See supra* Statement of the Case, at 16-17; A6-7. The plain language of the statute illustrates that VA's reading is incorrect. Moreover, VA's recent and proper adoption of a fear-related PTSD presumption, *see* 38 C.F.R. § 3.304(f)(3), contradicts the agency's contention.

The language of the statute is unambiguous. Under its terms, the Secretary of Veterans Affairs has broad authority to promulgate disability benefits rules based on the consideration of "the places, types, and circumstances of [a] veteran's service as shown by . . . all pertinent medical and lay evidence." 38 U.S.C. § 1154(a)(1); *see also id.* § 501(a). The Secretary's most recent exercise of this

authority to create a regulatory presumption was in 2010, when VA adopted the fear-based PTSD presumption. A31. Nothing in the plain language of 38 U.S.C. § 1154 precludes VA from promulgating an MST-related regulation such as the one requested by Petitioners, and it was legal error for VA to conclude otherwise. *Chevron* v. *NRDC, Inc.*, 467 U.S. 837, 843 (1984) (holding that court "must give effect to the unambiguously expressed intent of Congress" where Congress has "directly spoken to the precise question at issue").

VA suggests that it was precluded from considering an evidentiary presumption for MST on the grounds that "sexual assault is not *indisputably* associated with *particular* places, types, and circumstances of service." A7 (emphasis added). Notably, in reciting the statutory text, VA inserts the words "indisputably" and "particular" where Congress did not. VA does not cite to any legislative history or binding case law interpreting § 1154(a)(1) to contain the phantom word "indisputable," nor are Petitioners aware of any such authority. VA's insertion of the qualifier "particular" attempts to avoid the reality that military sexual trauma is a circumstance of service for nearly one in three women who serve and for over seventy percent of servicewomen who seek VA benefits for a service-connected disability. *Supra* Statement of the Case, at 4. The plain language of § 1154(a)(1) authorizes VA to give due consideration "to the places, types, and circumstances" of a veteran's service. VA seeks to narrow its broad

mandate by inserting additional qualifiers where Congress did not.

Nowhere else has VA required that veterans show that their injuries were "indisputably" associated with the place, type, and circumstances of service as a precondition for the promulgation of an evidentiary accommodation. Medical science, by its very nature, almost never provides a degree of certainty free of all doubt. In the end, VA's argument is contrary to its own treatment of veterans with other service-related injuries and the plain language of its authorizing statute. If Congress had conditioned VA rulemaking on the utter absence of medical disagreement—which Congress did not—then VA could not have promulgated the fear-based PTSD rule in 2010.

Because VA erred when it denied the Petition for Rulemaking on the mistaken belief that it lacks statutory authority to consider in-service sexual assault, the Court should remand with instructions for VA to reach the merits of Petitioners' claims. *See, e.g.*, *Animal Legal Def. Fund v. Madigan*, 781 F. Supp. 797, 805 (D.D.C. 1992), *vacated on other grounds sub nom. Animal Legal Def. Fund, Inc. v. Espy*, 23 F.3d 496 (D.C. Cir. 1994) (remanding denial of a rulemaking petition for reconsideration because the agency "did not consider the proper factors in refusing to institute rulemaking proceedings").

In short, the APA requires that the government engage in reasoned decisionmaking. The VA fails to provide a reasoned explanation for refusing to

promulgate new regulations for veterans suffering from MST-related PTSD when it has properly adopted evidentiary accommodations for many other hard to prove disabilities, including most recently fear-related PTSD. Instead, VA insists on adhering to its current regulations, which have indisputably resulted in delayed compensation for thousands of disabled veterans, sex discrimination, and radical variation in outcomes based on the happenstance of geography. Furthermore, VA's denial fails to consider several key factors raised by Petitioners in its decisionmaking.  VA's denial is arbitrary and capricious in violation of the APA.

## II.    VA's Denial is Discriminatory in Violation of the Equal Protection Component of the Fifth Amendment

VA's denial preserves a two-tiered regime for accessing disability benefits. Survivors of over 150 service-related injuries receive evidentiary accommodations—and properly so. *See supra* Statement of the Case, at 5-6. Survivors of military sexual trauma, however, must surmount a number of evidentiary hurdles to prove that they are telling the truth. As a result, their disability benefits claims are often delayed, denied, or arbitrarily adjudicated, and the survivors face high financial and emotional costs. Without an exceedingly persuasive justification for its intentional discrimination, VA's refusal to initiate a rulemaking violates the equal protection component of the Fifth Amendment. Since VA has given no justification, much less an exceedingly persuasive one, its denial cannot survive judicial scrutiny.

## A.     VA's Denial is Subject to Heightened Scrutiny, Which It Fails

The Due Process Clause of the Fifth Amendment contains an equal protection component. *Frontiero v. Richardson*, 411 U.S. 677, 679 (1973); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). The government violates equal protection where it "intentionally discriminate[s] against [individuals] on the basis of race, national origin or gender." *Berkley v. United States*, 287 F.3d 1076, 1084 (Fed. Cir. 2002); *see also Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272-74 (1979). "Intentional discrimination, however, can be demonstrated in . . . different ways." *Berkley*, 287 F.3d at 1084. A facially neutral law or regulation is intentionally discriminatory "if it was motivated by discriminatory animus and its application results in discriminatory effect." *Id*. Once established, the government's discrimination is subject to a heightened level of scrutiny. *See United States v. Virginia*, 518 U.S. 515, 531 & 555 (1996). The government must have an "exceedingly persuasive justification" to survive such scrutiny. *Id* at 531.

### 1.     VA's Current Regulations Evince a Discriminatory Animus

VA violates the Fifth Amendment's equal protection guarantee if a facially neutral policy is discriminatory in intent and effect. Determining discriminatory animus requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). "Departures from the normal procedural sequence . . .

might afford evidence that improper purposes are playing a role." *Id.* at 267. The

Supreme Court recently reaffirmed this principle in *United States v. Windsor*,

finding that the "unusual deviation from the usual tradition . . . [, which] operates

to deprive [a distinct class] of . . . benefits and responsibilities . . . . is strong

evidence of a law having the purpose and effect of disapproval of that class." 133

S. Ct. 2675, 2693 (2013)*; see also Dailey v. City of Lawton*, 425 F.2d 1037, 1040

(10th Cir. 1970) (municipal refusal to re-zone a plot of land violated equal

protection where surrounding land had been zoned as high-density residential

areas, leaving little reason to refuse the plaintiffs' application except

discriminatory animus).

In the present case, little else can explain VA's departure from past practice.

As previously discussed, *see supra* Part I.B, at 24, in 38 C.F.R. §§ 3.304-3.309,

VA has established that competent lay testimony is sufficient to prove service-

connection for a number of different disabilities that cover 150 health outcomes if

consistent with the places, types, and circumstances of service. *See generally* s*upra*

Statement of the Case, at 5-7. Under these presumptions, the veteran does not need

to submit any evidence beyond lay testimony. Veterans who were sexually

assaulted or harassed, however, must produce documentary or other corroborating

evidence of the trauma to prove service-connection. *See* 38 C.F.R. § 3.304(f)(5).

In this significant departure from past practice, VA's denial of the Petition for Rulemaking cements stereotypes of survivors of gender-based sexual violence. In particular, section 3.304(f)(5) is suspicious of survivors who do not immediately report their assaults and requires corroborating evidence, and possibly additional review, to protect against alleged false reporting. This departure evinces discriminatory animus against survivors. *See, e.g.*, *Virginia*, 518 U.S. at 565 (holding that Virginia could not prohibit women from attending a military academy based on generalizations about how women learn best).

To the extent that servicewomen are at a greater risk for MST-related PTSD than their male counterparts, this departure evidences discriminatory animus on the basis of gender. VA's deviation effectively creates a higher evidentiary burden on servicewomen, since servicewomen are more likely to endure sexual trauma and harassment during service. As a result, the denial of the Petition for Rulemaking "bears more heavily" on women, thereby betraying VA's discriminatory animus. *Cf. Washington v. Davis*, 426 U.S. 229, 242 (1976) ("[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another.").[5]

---

[5] Consistent with the prioritization of injuries disproportionately suffered by men over those suffered by women, the regulatory history of presumptions frequently uses male pronouns. *See, e.g.*, Pension, Compensation and Dependency and Indemnity Compensation, 26 Fed. Reg. 1561, 1563-66 (Feb. 24, 1961); Disease Associated with Exposure to Certain Herbicide Agents: Peripheral Neuropathy 78

When discriminatory animus motivates official policy that treats survivors of gender-based violence differently than others similarly situated, and results in injury, courts have found that the policy violates the equal protection guarantee. *See Soto v. Flores*, 103 F.3d 1056, 1066 (1st Cir.1997) (explaining that equal protection is violated when "there is a policy or custom of providing less protection to victims of domestic violence than to victims of other crimes, . . . gender discrimination is a motivating factor, and [the individual] was injured by the practice"); *Ricketts v. City of Columbia*, 36 F.3d 775, 779 (8th Cir.1994) (applying same standard to an equal protection claim against a municipality); *Eagleston v. Guido*, 41 F.3d 865, 878 (2d Cir.1994) (applying the same standard). Given the discriminatory animus and effect, *see infra* Part II.A.2, at 41-42, of VA's current policies, VA's denial of the Petition of Rulemaking violates the equal protection guarantee.

### 2. VA's Denial Perpetuates a Discriminatory Effect

Statistics that demonstrate a "disproportionate impact" can make out a prima facie case of discriminatory effect. *Cf. Dothard v. Rawlinson*, 433 U.S. 321, 330 (1977) (affirming district court's finding of a prima facie case of unlawful sex discrimination based on a "statistical showing of disproportionate impact"). VA's current regulatory scheme disproportionally impacts MST survivors. For as far

---

Fed. Reg. 54,673, 54,763 (Sept. 6, 2013) (codified at 38 C.F.R. pt. 3).

back as records are available, VA has granted MST-related PTSD claims at lower rates than other PTSD claims. *See* A173. Since 2008, the difference in average annual grant rates has varied between 16.5% and 29.6%. *See, id.* Because 70% of women and only 4% of men report MST-related experiences when seeking disability benefits for PTSD, this discrepancy also has a disproportionate impact on women—regardless of how many men and women are granted disability benefits.[6] *See supra* Statement of the Case, at 11.

VA's new procedures and training have not eliminated the discriminatory effect and have only produced more inconsistent results. As previously noted, VA's own records indicate that grant rates vary widely by local office, adjudicator interpretations remain unpredictable, and errors are rampant. *See, e.g.*, *supra* Statement of the Case, at 11, 15. VA's refusal to undertake a rulemaking perpetuates this chaotic and error-riddled system, entrenching a discriminatory effect against MST survivors.

### 3. VA Does Not Provide an Exceedingly Persuasive Justification for its Denial

If government action is "overtly or covertly" discriminatory without an exceedingly persuasive justification, it cannot survive heightened scrutiny. *Feeney*,

---

[6] In the employment context, the Supreme Court held that a law impacting job eligibility of 41% of Alabama women and less than 1% of Alabama men had a discriminatory effect—regardless of the number of men and women actually hired. *Dothard*, 433 U.S. at 330-31.

442 U.S. at 273. To be exceedingly persuasive, VA must show that the action "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Virginia*, 518 U.S. at 524. "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Id*. at 533.

In denying the Petition for Rulemaking, VA does not advance a single "important governmental objective," *id.* at 524, served by the current regulation governing MST-related PTSD claims, A4-7. Nor does VA explain how its discriminatory MST regulations "substantially relate[] to the achievement of those objectives." *Id*. Rather, VA argues that the new practices and additional training on the current rules have improved grant rates for MST-related claims. *See* A6. Moreover, VA's argument does not address the MST regulation's discriminatory departure, which applies different standards to claims predominately filed by women from those predominately filed by men. Any new argument in response to litigation would imply the argument is not "genuine." VA's refusal to undertake a rulemaking cannot survive "skeptical scrutiny." *Virginia*, 518 U.S. at 531.

**B.    VA's Denial Also Fails Rational Basis Review**

Imposing a higher evidentiary burden on MST survivors bears no rational relationship to any legitimate state interest. Accordingly, VA's denial is irrational and cannot survive rationality review.

Equal protection requires government action to have a rational basis, even if the action involves no suspect class or fundamental right. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (explaining that statutory or regulatory classifications must be "rationally related to a legitimate state interest"). Classifications that are overly broad or narrow, or unmoored from reality make it difficult to identify a rational relationship between the classification and the state interest. *Romer v. Evans*, 517 U.S. 620, 632-33 (1996). And "[d]iscriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision." *Id.* at 633.

"A law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense." *Id*. VA distributes its benefits unequally, granting fewer benefits to MST survivors and making it more difficult for this class of veterans to seek disability compensation from VA.

## 1. VA's Denial is Not Rationally Related to a Legitimate Government Objective

The Supreme Court has explained that "even in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained." *Romer*, 517 U.S. at 632. VA, however, does not appear to have any objective, much less a legitimate one, for its denial of the Petition for Rulemaking.

VA fails to present a single objective served by maintaining its current regulation. *See supra* Statement of the Case, at 14-20. In fact, few objectives could possibly be served by treating one veteran suffering from PTSD differently from another veteran suffering from PTSD. But if past actions denying benefits to a distinct class of citizens serve as any guide, then VA's only plausible objectives are to preserve resources or prevent fraud. *See, e.g.*, *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973) (holding that the government's supposed interest in preventing food stamp fraud did not survive rational basis review). In the instant case, recognizing the difficulties inherent to claims of common or hard-to-document forms of PTSD only to relegate one specific form of PTSD to a second tier of claims does not serve either objective, even if legitimate.

Without more, however, resource preservation alone is not even a legitimate objective. *See, e.g.*, *Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 263 (1974) (rejecting arguments that limiting complementary medical care to residents who

had lived in the county at least one year helped the county save money or prevent fraud). Preferring to spend less money on one class of veterans suffering from service-connected PTSD in order to spend more on another is the exact sort of unequal treatment the Fifth Amendment proscribes. "[A] concern for the preservation of resources standing alone can hardly justify the classification used in allocating those resources." *Plyler v. Doe*, 457 U.S. 202, 227 (1982).

Even if formulated differently, any argument about saving money is not likely to be grounded in the facts. In fiscal year 2013, VA granted 3,091 out of 6,270 MST-related claims. A6. Over 3.7 million veterans currently receive disability benefits from VA. *See* National Center for Veterans Analysis and Statistics, *Service-Connected Disabled Veterans by Disability Rating Group: FY1986-FY2013*, DEP'T OF VETERANS AFFAIRS (2014). Thus, adoption of a regulatory presumption for MST-related PTSD comparable to that for other forms of PTSD would not have mathematically increased the number of total beneficiaries by even one-tenth of one percent. In fact, adopting an evidentiary accommodation for MST survivors would likely increase the efficiency of the adjudication process and thereby preserve financial resources—as VA, itself, has contended when justifying other recent evidentiary presumptions. *See, e.g.*, Stressor Determinations for Posttraumatic Stress Disorder, 74 Fed. Reg. 42,617, 42,618 (proposed Aug. 24, 2009) (codified at 38 C.F.R. § 3.304(f)(3)) ("The

proposed [presumption] would benefit all veterans . . . . Improved timeliness, consistent decision-making, and equitable resolution of PTSD claims are the intended results of the revised regulation.").

Conversely, denying benefits to veterans suffering from MST-related PTSD might even increase the costs to VA, as MST survivors will likely need to draw on other VA resources to secure medical treatment, housing, or employment. VA's perceived economic gain thus "may well be illusory." *Mem'l Hosp.*, 415 U.S. at 265. This is especially likely given that standardizing the evidentiary burden across PTSD-related claims would likely streamline the claims review process, saving VA administrative costs. *See* A352-55.

Similarly, VA's purpose in imposing a higher burden on MST survivors cannot be rationally related to an interest in preventing fraud. First and foremost, fraudulent claims are not likely to be a problem. MST survivors face high costs to making fraudulent claims, such as professional fall-out, social alienation, and the likelihood of re-traumatization. *See* A355-56.

Second, VA has adopted multiple evidentiary presumptions for PTSD-related claims in 38 C.F.R. §§ 3.304(f)(1)-(f)(4), despite concern over potentially fraudulent claims for combat- or fear-related PTSD. *Veterans Disability Benefits Claims Modernization Act of 2008: Hearing Before the Subcomm. on Disability Assistance and Memorial Affairs*, 110th Cong. (2008) (statements of Raymond C.

Kelley, Nat'l Legislative Dir., Am. Veterans, and Kerry Baker, Assoc. Nat'l Legislative Dir., Disabled Am. Veterans). For other presumptions, VA has explained that it has sufficient safeguards in place to detect and deter fraud. *See, e.g.*, 75 Fed. Reg. at 39,845 (stating that VA "believe[s] the likelihood of fraud to be minimal" for fear-related PTSD claims). An accommodation for MST-related PTSD would be subject to the same safeguards.

Finally, DoD has conceded that false reporting of rape, sexual assault, and sexual harassment is nothing more than a "[c]ommonly accepted myth[]." A356. According to DoD, "estimates for false reports range from 2 to 8 percent, similar to other felonies." *Id.* There is no reason to believe that fraudulent claims would be submitted to VA at a higher rate than to DoD. To that end, VA's classification cannot be rational if it is meant to address a problem that does not exist. Nor is it rational to require corroborating evidence for MST-related PTSD claims, when VA does not ask that of other hard-to-prove PTSD claims.

### 2. VA's Denial Reflects Barefaced Discrimination Against MST Survivors

With no legitimate reason to effectively impose a higher evidentiary burden on MST survivors,[7] VA's denial of the rulemaking petition cannot be explained by

---

[7] The current regulation imposes this high burden on all personal assaults, which it defines to include MST. However, since MST is far harder to prove than other common types of "personal assault," *see* A321-22, the personal assault evidentiary standards disproportionately impact veterans claiming MST-related PTSD benefits.

anything other than an intent to discriminate against MST survivors. That intent becomes all the more evident in light of the considerations relevant to rational basis review: "What class is harmed by the legislation, and has it been subjected to a 'tradition of disfavor' . . . ? What is the public purpose that is being served by the law? What is the characteristic of the disadvantaged class that justifies the disparate treatment?" *City of Cleburne,* 473 U.S. at 453 (Stevens, J., concurring). The answers to these questions demonstrate VA's intention to discriminate.

First, VA's denial harms a distinct and vulnerable class of veterans who suffer from PTSD related to military sexual trauma. Second, in both civilian and non-civilian life, survivors of sexual assault have long been subjected to a "tradition of disfavor." *Id*. In the civilian context, police, prosecutors, and even medical personnel have a history of questioning a survivor's credibility, blaming survivors for their assault, and devaluing the assault of survivors with certain types of past sexual experience. *See* Sarah Ben-David & Ofra Schneider, *Rape Perceptions, Gender Role Attitudes, and Victim-Perpetrator Acquaintance*, 53 SEX ROLES 385 (2005).

In the VA context, the evidence indicates that these same biases are pervasive. In particular, claims adjudicators often dismiss viable MST-related claims as non-credible, despite evidence to the contrary. *See* A328-36.

Adjudicators frequently expect MST survivors to react to their assault in specific ways, discrediting them if they do not respond as expected. *Id.*

Nothing justifies this disparate treatment of veterans who suffered MST. Treating a distinct class of veterans differently on the basis that they have survived sexual assault is necessarily irrational. It does not serve any legitimate objective, but instead "treats the same conduct differently based solely on the participants." *Lawrence v. Texas*, 539 U.S. 558, 581 (2003) (O'Connor, J., concurring). The result is the perpetuation of a "classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit." *Romer*, 517 U.S. at 635.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court hold VA's denial unlawful and reverse the agency's decision. In the alternative, Petitioners request that the Court vacate and remand the decision to VA to provide reasoned explanation or to institute a new rulemaking.

December 4, 2014                                Respectfully submitted,

/s/ Michael J. Wishnie
Michael J. Wishnie, Supervising Attorney
Veterans Legal Services Clinic
Jerome N. Frank Legal Services Org.
P.O. Box 209090
New Haven, CT 06520-9090
(203) 432-4800

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of
Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☐ The brief contains 11,155 words, excluding the parts of the brief exempted
by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of
Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and
the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☐ The brief has been prepared in a proportionally spaced typeface using
Microsoft Word in 14-point Times New Roman.

/s/ Michael J. Wishnie
Michael J. Wishnie

*Counsel for Petitioners*

# ADDENDUM

Department of Veterans Affairs Office of the General Counsel,
Letter Decision Denying Petition for Rulemaking (July 14, 2014)



**VA** | U.S. Department
of Veterans Affairs

**Office of the General Counsel**
Washington DC 20420

**JUL 14 2014**

022
In Reply Refer To:

Ms. Abigail Graber
The Jerome N. Frank Legal Services Organization
Yale Law School
P.O. Box 209090
New Haven, CT 06520

Dear Ms. Graber:

This is in response to your petition for rulemaking. You request that the Department of Veterans Affairs (VA) promulgate a regulation governing claims for compensation for mental health disabilities incurred or aggravated as a result of military sexual trauma (MST). Your proposal would eliminate the requirement for corroborating evidence that a claimed MST occurred if a stressor claimed by a Veteran is related to the Veteran's reported experience of such trauma and a psychiatrist or psychologist confirms that the claimed stressor is adequate to support a diagnosis of a mental health condition and that the Veteran's symptoms are related to the claimed stressor. You filed this request on behalf of Service Women's Action Network and Vietnam Veterans of America. The Acting Secretary of Veterans Affairs has asked that I inform you that VA declines to promulgate a regulation as requested in your petition.

With regard to your assertion that it is often difficult to produce evidence to establish occurrence of a personal assault, VA has acknowledged the sensitive nature of MST stressors and the reluctance on the part of Servicemembers to report such events during military service. The Department therefore promulgated a regulation governing adjudication of MST claims, which VA believes addresses the difficulty of producing evidence to prove occurrence of an in-service personal assault. In order to establish service connection for posttraumatic stress disorder (PTSD) under 38 C.F.R. § 3.304(f), the record must contain medical evidence diagnosing PTSD and establishing a link between a Veteran's current symptoms and an in-service stressor and credible supporting evidence that the claimed in-service stressor occurred. In 2002, VA promulgated 38 C.F.R. § 3.304(f)(3)(currently codified at 38 C.F.R. § 3.304(f)(5)), concerning the proof necessary to establish occurrence of a stressor in claims for service connection for PTSD resulting from personal assault, including MST. 67 Fed. Reg. 10,330 (Mar. 7, 2002). The regulation states that "evidence from sources other than a veteran's service records may corroborate the veteran's account of the stressor incident." This includes records from law enforcement, authorities and rape crisis centers, pregnancy tests, statements from family members, roommates, and fellow Servicemembers, and evidence of behavioral changes. Section 3.304(f)(5) requires notification to the Veteran of the types of evidence that may establish the stressor, and provides that "VA may submit any evidence that it receives to an appropriate medical or mental health professional for an opinion as to whether it indicates that a personal assault occurred." In addition, under section 3.304(f)(5), a medical opinion based on a post-service

examination of a Veteran may serve as evidence supporting occurrence of an in-service assault.

You state that the list of potential sources of corroborating evidence in VA's regulation is deficient because not all victims of assault will respond in the same manner and thus not all victims will, for example, display decreased work performance. However, VA's regulation does not require the same form of corroborating evidence for all claimants, but lists a variety of sources that may provide such corroborating evidence, to include evidence of decreased work performance, evidence of behavioral changes, or statements from family members, roommates, fellow Servicemembers, or clergy. Further, the regulation makes clear that this list is not exclusive and that other types of evidence may also serve to establish that an assault occurred.

We note as well that, as a result of a recent court decision in *AZ v. Shinseki* and *AY v. Shinseki*, 731 F.3d 1303 (Fed. Cir. 2013), the absence of a service record of a sexual assault or a failure to report the assault to military authorities cannot be considered by VA as evidence that the sexual assault did not occur.

You assert that "VA adjudicators often misapply the current evidentiary standard" in adjudicating MST claims. Specifically, you state that adjudicators often fail to acknowledge the sufficiency of the very types of evidence that section 3.304(f)(5) indicates may constitute sufficient evidence that an assault occurred. You state that this may result from conscious or unconscious bias toward claims of personal assault. VA is committed to serving our Nation's Veterans by accurately adjudicating claims based on MST in a fair, consistent, and thoughtful manner, and VA is very mindful of the uniquely sensitive nature of these claims. In response to concerns similar to those expressed in your petition, VA has over the past several years undertaken a number of measures to ensure that Department employees develop and adjudicate MST claims consistent with VA's regulation and with sensitivity to the unique circumstances presented by each individual claim.

In 2011, the Veterans Benefits Administration (VBA) directed regional offices (ROs) to designate adjudicators with experience and skills processing complex claims to assist in development of MST claims and adjudication of the claims. This was done to enable skilled and sensitive adjudicators to develop the expertise and familiarity to address the unique issues presented in these claims. In addition, VBA developed additional guidance and training for these adjudicators, including a VBA Training Letter 11-05 (Dec. 2, 2011)) and training sessions, which included a 1.5 hour nationwide Microsoft Live Meeting broadcast on MST claims adjudication, and a separate 4-hour instructor-led training session on MST provided at VA regional offices. These trainings discussed the varied types of evidence that may support an MST claim and the procedures for developing the claims in a thorough and sensitive manner. Finally, the Veterans Health Administration, in collaboration with VBA, provided a 1.5 hour information session regarding how to conduct medical examinations of Veterans claiming disability as a result of MST.

Ms. Abigail Graber

As a result of this training, VA's grant rate for PTSD claims based on MST rose from a rate of 38 percent prior to this training initiative to a rate of 52 percent at the end of February 2013, which was roughly comparable to the 59-percent grant rate at that time for all PTSD claims. *Legislative Hearing on H.R. 569, H.R. 570, H.R. 602, H.R. 671, H.R. 679, H.R. 733, H.R. 894 and H.R. 1405 Before the Subcomm. On Disability Assistance and Memorial Affairs of the H. Comm. On Veterans' Affairs,* 113th Cong. (Apr. 16, 2013) (statement of David R. McLenachen, Director, Pension and Fiduciary Service, U.S. Dep't of Veterans Affairs), available at http://veterans.house.gov/witness-testimony/david-r-mclenachen. During fiscal year (FY) 2013, VA granted service connection for 3,091 out of 6270 PTSD claims based on MST, resulting in an average grant rate of 49 percent. During FY 2013, the average grant rate for all PTSD claims was 55 percent. This higher grant rate for all claims is likely due to the numerous combat-related PTSD claims that VA has received. Regarding gender variations, the grant rate for male Veterans claiming PTSD based on MST rose to within 7 points of the grant rate for female Veterans filing the same claims. VA continues to monitor MST and overall PTSD grant rates closely.

Furthermore, in April 2013, VA sent letters to Veterans whose claims were denied between September 2010 and April 2013, inviting them to contact VA if they would like their PTSD claims reviewed to determine entitlement to service connection. Veterans whose claims were denied prior to September 2010 could also resubmit their claims but were not provided a letter notifying them of the opportunity because prior to September 2010, VA did not systematically track claims based on MST. An addendum to Training Letter 11-05 was published on June 17, 2013, outlining procedures that ROs must take to complete a special review of previously denied claims for PTSD based on MST.

Your letter also states that "combat veterans must prove only that they served in general conditions in which stressors causing PTSD frequently occur" and "do not have to present any threshold evidence of the specific stressor." This is a misstatement of the law. Rather, a Veteran must establish that he or she "engaged in combat with the enemy," *i.e.,* "personally participated in events constituting an actual fight or encounter with a military foe or hostile unit or instrumentality," before the Veteran's testimony alone may establish occurrence of the in-service stressor under 38 C.F.R. § 304(f)(2). *Moran v. Peake*, 525 F.3d 1157, 1159 (Fed. Cir. 2008); *Stone v. Nicholson*, 480 F.3d 1111, 1113 (Fed. Cir. 2007).

Finally, you advocate for a rule for MST claims similar to 38 C.F.R. § 3.304(f)(3), which eliminates the requirement for corroborating that the claimed in-service stressor occurred if a stressor claimed by a Veteran is related to the Veteran's fear of hostile military or terrorist activity and a VA psychiatrist or psychologist, or a psychiatrist or psychologist with whom VA has contracted, confirms that the claimed stressor is adequate to support a diagnosis of PTSD and that the Veteran's symptoms are related to the claimed stressor, provided that the claimed stressor is consistent with the places, types, and circumstances of the Veteran's service. Under 38 U.S.C. § 1154(a), VA must consider the places, types, and circumstances of a Veteran's service when deciding whether the Veteran incurred a disease or injury in service. VA promulgated section 3.304(f)(3) based on an Institute of Medicine finding that

4.

military personnel deployed to war zone, even if they do not experience direct combat, experience other potent stressors as a result of the circumstances of their service. VA concluded that a reduced evidentiary burden is justified where the circumstances of a Veteran's service are likely to have placed the Veteran in a stressful situation related to fear of hostile military or terrorist activity. However, sexual assault is not indisputably associated with particular places, types, and circumstances of service. VA has therefore promulgated 38 C.F.R. § 3.304(f)(5) to address the difficulty of producing evidence to prove occurrence of an in-service personal assault. VA believes this regulation, and the training program VA has established, provide for the accurate, fair, and sensitive adjudication of claims based on MST.

For these reasons, VA denies your petition for rulemaking. I hope this information is helpful to you.

Sincerely,

Tammy L. Kennedy
Acting General Counsel

**PROOF OF SERVICE**

I hereby certify under penalty of perjury, that on this 8th day of December, 2014, a copy of the foregoing PETITIONERS' CORRECTED OPENING BRIEF was filed electronically. This filing was served electronically to all parties by operation of the Court's electronic filing system.


<u>/s/ Michael J. Wishnie</u>